IN THE UNITED STATES BANKRUPTCY COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **GREGORY R. STEENSON** | ) | **CASE 16-81388-CRJ7** |
| | ) | |

---

| | | |
|---|---|---|
| **PRICEVILLE PARTNERS, LLC, a** | ) | |
| **Debtor-in-Possession, which formerly** | ) | |
| **did business as Performance Auto Sales** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | AP No. _____ |
| | ) | |
| **GREGORY R. STEENSON,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

Comes now Priceville Partners, LLC, a Debtor-in-Possession, in the United States Bankruptcy Court for the Northern District of Alabama, Northern Division, which case is numbered 16-80675 and which formerly did business as Performance Auto Sales ("PPI") and hereby submits this Complaint against the Debtor/Defendant, Gregory R. Steenson ("Steenson"). In support of this Complaint, PPI sets forth as follows:

## PARTIES

1. PPI is a Debtor-in-Possession before the United States Bankruptcy Court for the Northern District of Alabama, Northern Division, which Case is assigned no. 16-80675. It continues to serve as a Debtor-in-Possession since the filing of its original Chapter 11 Petition on March 4, 2016. No Trustee or Unsecured Creditors Committee has been appointed.

2. Steenson filed his Voluntary Petition with this Court on the 10th day of May, 2016 under Chapter 7 of the United States Bankruptcy Code. Judith Thompson was duly appointed Trustee of the Chapter 7 case.

3. As of the date of the filing of his Petition, Steenson owned a 40% member interest in PPI, which is an Alabama limited liability company formed in 2013.

4. PPI was actively involved in the marketing and sale of automobiles, effectively as a "buy here, pay here" automobile dealership. Prior to the filing of its Petition, PPI also operated a division known as Title Mart (Title Mart of Priceville, Title Mart of Hanceville, Title Mart of Moulton and Title Mart of Chelsea), through which PPI furnished title loans to third-parties.

5. PPI's primary sale location was located at 2903 Point Mallard Parkway S.E. in Decatur, Alabama. Upon the filing of its Petition, this location was closed and PPI no longer buys or sells automobiles and no longer makes title pawn loans. PPI has continued to operate its business through the collection of accounts and notes receivable from third parties.

## JURISDICTION

6. On or about the 10th day of May, 2016 (the "Petition Date") Steenson voluntarily initiated this case by seeking protection under Chapter 7 of 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code").

7. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. The matter is a core proceeding under 28 U.S.C. § 157(b). This matter involves the determination of the dischargeability of debts that impact the Debtor's Estate, and similarly involves the determination of whether Steenson should obtain any Discharge of his obligations.

8. This action is brought pursuant to 11 U.S.C. §§ 105, 523 and 727.

2

Case 16-80073-CRJ   Doc 1   Filed 08/11/16   Entered 08/11/16 14:32:41   Desc Main
Document      Page 2 of 15

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

10. As a creditor and party in interest in the Steenson Bankruptcy Case, PPI is authorized to bring this action pursuant to § 523 as well as § 727(c)(1) of the Bankruptcy Code.

## SUMMARY

11. As set forth hereinbelow, PPI was an automobile dealership and title pawn lender, in which Steenson acted as 40% member, and basically served as its General Manager for sales and related operations. In his capacity as such, Steenson was authorized to sign checks of PPI, collect money for deposit into the banking account(s) of PPI, and was authorized to use the credit card of PPI for company purposes.

12. As set forth in greater detail below, during his involvement with PPI, Steenson utilized funds and assets of PPI to pay personal obligations, cash checks for his personal use, bought/sold/operated vehicles and water craft using the name of PPI but for personal use. In the process, Steenson embezzled funds and assets of PPI, or generally conveyed assets of PPI (to include the fraudulent transfer of assets within the one year next preceding the filing of his Petition), committed fraud and defalcation during the course of his fiduciary obligations owed to PPI, and caused wilful injury to PPI. He induced investors and lenders to advance funds to PPI by providing false information and materials reflecting false profits. He also obtained funds from the sale of automobiles subject to a lien or ownership in favor of others without paying off such lien or ownership interests with sale proceeds.

13. Further, upon the filing of his Petition, Steenson failed to comply with the disclosure obligations required both with his Petition, Schedules and with required Statement of Affairs (both as amended). Steenson failed to list his income from PPI; failed to identify tax obligations and other

3

obligations; failed to list PPI and other creditors in his Schedules; originally failed to list a $5,223,393 million criminal restitution obligation; failed to list all transfers within the two years next preceding the filing of the Petition; failed to adequately identify his dissipation of assets and to keep financial records as required; filed a false statement under oath; listed as exempt certain assets which, in fact, did not exist as exempt assets at the point in time of the filing of the Petition; and, failed to remedy or correct any such mistakes in his sworn amended Petition.

14. As such, the obligations identified in more detail hereinbelow owed by Steenson to PPI, should be excepted from his Discharge and his Discharge should be avoided for violation of relevant sections of Section 727 as well as certain case authority (see, *Husk International Electronics, Inc. v. Ritz*, 136 S. Ct. 1581, 194 L.Ed.2d 655) (May 16, 2016).

## FACTUAL BACKGROUND

15. PPI originally did business as a proprietorship operated by Ben Jeffreys, with some assistance from Harold Jeffreys (his father) and Steenson. In June, 2013, PPI was organized as an Alabama limited liability company. Upon creation, Steenson owned 40% of the entity, Harold Jeffreys owned 40% of the entity and Ben Jeffreys owned 20% of the entity. Steenson provided general managerial services for the sale of automobiles to third parties on a "buy here, pay here" basis. The 20% interest of Ben Jeffreys was later transferred to Harold Jeffreys, thereby causing Harold Jeffreys to hold 60% compared to Steenson's 40%.

16. Sometime shortly after creation, PPI began making title loans and, in the process, operated "Title Mart" divisions in Decatur, Priceville, Hanceville, Moulton, as well as Chelsea, Alabama.

4

17. The primary bank account of PPI was located at Renasant Bank. Harold Jeffreys, Ben Jeffreys, and Steenson each were authorized signatories on such account, with additional individuals being authorized to sign checks at one or more of the separate title loan locations where separate accounts were maintained.

18. Almost immediately from its inception, Steenson, along with various of his family members (to include his father, brother and stepson), as well as other members and employees of PPI, utilized vehicles and watercraft owned or leased by PPI - all without payment. Such vehicles or water craft were utilized for extended periods of time without payment, and without recognition of the depreciation or diminution in value occasioned by such use.

19. Similarly, although PPI consistently charged third-party purchasers of its vehicles a 21% interest rate, Steenson authorized family members, employees, and his personal friends to be charged far lower interest rates ranging from 7% to 0% on vehicles they purchased or leased, all contrary to the custom and standard of the business and industry, and without benefit to PPI.

20. Joseph Wynn, CPA, maintained monthly books and records of PPI beginning in 2013 and consistently provided these on an interim basis to the three members of PPI through and until January, 2016. Steenson served as General Manager and primary operator and conducted weekly meetings with staff and Members, as well as several investors. At these meetings the financial position of PPI was discussed, and financial documents circulated at such meetings, as prepared or initiated by Steenson.

21. From its inception, PPI was funded almost exclusively by Harold Jeffreys. Thereafter, other individual investors "loaned" or otherwise injected capital into PPI for its title loan

5

operation and to purchase automobiles. Steenson only "invested" $13,000, whereas Jeffreys invested or loaned between $2.7 million and $3.4 million.

22. In 2015, Steenson sold and transferred six or seven automobiles owned by PPI to Mr. Mackey Nesmith or his company, Parkway Auto Sales. In exchange for the transfer of such vehicles, Mr. Nesmith or Parkway Auto Sales transferred to Steenson, individually, a 1994-95 Sea Ray 400 boat known as the "Risky Business." The Bill of Sale was provided to, and the boat was registered in the name of, Steenson.

23. Shortly following the transfer of the boat obtained with PPI assets, but placed in the name of Steenson individually, Steenson transferred the "Risky Business" to Mr. Roger Renfroe, who previously loaned Steenson funds on a personal basis. The transfer of the boat from Steenson to Mr. Renfroe was in partial satisfaction of the personal obligation owed by Steenson to Renfroe, even though the asset being transferred was subject to the constructive trust in favor of PPI and/or subject to a lien in favor of the Federal Government for court ordered restitution owed by Steenson, accruing from a prior criminal conviction for bank fraud.

24. Further, a vehicle that PPI had sold to a third party but had retained the Certificate of Title to reflect its collateral interest was "totaled" in an automobile accident. The Insurance carrier for the record owner paid PPI a check totaling $6,500, such sum representing payment of the obligation owed by such third party to PPI. Upon receipt of the check by PPI, Steenson took such check to Roger Renfroe, endorsed the back of the check, and delivered that check to Mr. Renfroe in satisfaction of the balance of his personal obligations to Mr. Renfroe.

25. In so doing, Steenson "paid" Renfroe a total of approximately $46,500 in assets in a boat worth approximately $40,000 and insurance proceeds reflected at $6,500. PPI obtained no benefit from either transfer to Mr. Renfroe by Steenson.

26. Bill Dobbs loaned or advanced funds to Steenson, individually. In partial payment of such personal obligation, Steenson caused PPI to pay Dobbs $1,000 per month, reflecting total payments of $13,000. Dobbs is not listed as a personal creditor on the Schedules of Steenson and the funds paid to Dobbs were funds of PPI, but transferred in partial satisfaction of a personal obligation of Steenson. PPI obtained no benefit from such transfers.

27. Similarly, Jerrall Miller was owed the total sum of $140,000 for a personal debt owed by Steenson. During 2015, Steenson caused Jerrall Miller to be paid $9,500 in checks from the account of PPI. PPI obtained no benefit from such transfer, which was in partial payment of Steenson's personal obligation.

28. Somewhat similarly, Steenson used corporate funds of PPI to pay Jim Barrett a personal obligation totaling $8,500.

29. Steenson (individually or others acting with his authority - to include an ex-wife) purchased jewelry from Jimmy Smith Jewelry. Steenson then paid $8,500, in two checks written on the account of PPI in satisfaction or partial satisfaction of such personal jewelry purchases. PPI obtained no benefit from such transfers.

30. Steenson further caused the transfer of $5,137 to Nancy Smith in satisfaction of personal obligations. The transfers consisted of a series of checks from the account of PPI and for which PPI obtained no benefit.

7

31. As stated, monthly financial information was supplied by Joseph Wynn to Steenson and others. Contained within such financial information was identification of all checks written as of that date from the account of PPI, with the general ledger supplying information as to how the identified item allegedly was an expense of PPI. Steenson and the Members were to inform Wynn whether such checks were for personal use. Included within such alleged expenses were personal items paid for the benefit of Steenson but which were paid by PPI. These included individuals identified as "contract labor" within the general ledger, included personal expenses, meals, and further included the Burning Tree Country Club monthly dues of Steenson, personally. PPI obtained no benefit from such transfers and Wynn was not made aware of the payments' actual purpose.

32. Similarly, Steenson used the business credit card of PPI to purchase numerous personal items for his own use or that of his family and friends. Theses purchases were not "repaid" to PPI, which obtained no benefit from such personal use of the business credit card.

33. As stated above, through PPI, Steenson obtained the use of various vehicles and water craft. Included within these were a 2014 Ford F150 (subject to a lien in favor of Ford Motor Credit); one 2014 Honda Four Wheeler; one 2014 Green Honda Sea Doo; one 2015 Polaris (ultimately sold to Mackey Nesmith - Parkway Motors); one 2014 Polaris. These vehicles and water craft, and others, were used by Steenson individually, by Steenson's then wife, by Steenson's brother, father and stepson, all without payment to PPI for such use. Though the vehicles and water craft were owned by PPI, the use of such vehicles without remuneration caused damage to PPI in that the ultimate resale of such units was at a far depreciated value.

34. Because of his position with PPI, Steenson owed a fiduciary obligation not only to the other Member(s) but also to PPI itself. During the course of his serving as General Manager and

as Member, Steenson and others "invested" in various "side deals" in which several individuals, to include Steenson, pooled funds to purchase a block of automobiles which, then, would be resold for a profit. Although the collective investment funds were deposited into the account of PPI, PPI derived no benefit from the purchase or subsequent resale of such vehicles, as the profits of such sale were divided on a pro-rata basis amongst those participating in that particular pool or "side deal." Such activities constituted business opportunities of PPI which should have enjoyed the profit obtained by such individuals, to include Steenson.

35. On multiple occasions, PPI purchased automobiles which were financed by third parties such as Lynn Layton Ford or Lynn Layton Chevrolet, Ally Finance, and/or Ford Motor Credit. Somewhat similarly, PPI purchased automobiles from Lynn Layton or some other dealership, and then leased such vehicle through Ally or Ford Motor Credit.

36. On multiple occasions, Steenson, either individually or directing others, sold such vehicles to third parties. These vehicles were subject to the lien in favor of such lenders, and yet, upon obtaining the purchase price for such vehicles, Steenson (or others at PPI and at the direction of Steenson) failed to pay such lender its obligation. In so doing, third party purchasers could not obtain clear title to the identified vehicles. These transactions include, at least, vehicles sold to Bill Dobbs, Elaine Boyette, Jason Segar, and Roger Renfroe holds a title certificate on a vehicle in which he has no ownership interest.

37. The General Ledger of PPI reflects numerous checks written to "cash" from which Steenson and others obtained cash funds from the checking account of PPI. Upon information and belief, in multiple instances such cash was not used solely for the corporate benefit of PPI but, instead, were used for the personal benefit of Steenson (and others). Moreover, on more than one

9

occasion, Steenson obtained cash payments from customers of PPI, which payments were to be applied to the account of such customer. Instead of placing such cash funds into the account of PPI, Steenson retained for his personal benefit some or all of such cash payments. This included not only Myron Orr in January 2016, but also on multiple other occasions. Because of such transactions, Steenson was not paid a salary by PPI but, instead, used PPI as his personal checking account and used the checking account of PPI to pay for his personal obligations. Few of such personal obligations were "accounted for" as income to Steenson; that said, however, the vast majority of such transactions were not accounted for in this fashion and constitute an embezzlement of funds of PPI for the personal benefit of Steenson and to the detriment of the creditors of PPI.

38. Steenson conducted the weekly meetings of staff and investors as described above. In so doing, he presented financial information to such staff, employees and investors/lenders which he knew or should have known were false but which lead such investors/lenders to extend their loans, not call their loans but otherwise accrue interest, and to invest additional funds. Such actions were effectively a Ponzi Scheme which further served as a fraud on such parties by providing false books and financial data.

39. Joseph Wynn, the accountant for PPI, was not even aware of the title pawn division(s) of the business (which originated in 2013 or 2014), until October 2015. At that point in time, Mr. Wynn attempted to reconstruct a General Ledger for the Title Mart portion of the business. For the books to match the alleged assets and liabilities of the Title Mart division with the records he had been able to resurrect and compile, Steenson directed Wynn to simply increase the receivable amount of Title Mart from approximately $74,000 to approximately $5,200,000. This latter figure was used by Steenson and others in the presentation of the financial information during the weekly meetings,

all in an effort to reflect far more profitability than was actually the case, thereby causing such investors/lenders to leave funds with the business or otherwise make additional advances.

40. As stated above, Steenson filed his individual Petition on the 10th day of May, 2016. In so doing, he filed his Petition, Schedules, and Statement of Affairs under oath, swearing to the accuracy of the information supplied. Thereafter, Steenson filed an amendment to these Schedules attempting to correct noted oversights or errors.

41. Even after the amendments identified above, Steenson's Schedule E/F Part 1 fails to list taxes he owes for 2014 and taxes due for 2015 (for which he has received a 1099). Originally, he did not list the $5,223,393 reclamation indebtedness and lien until such error was presented to him during the course of his 2004 Examination. Steenson does not list his indebtedness to PPI. Steenson does not list his membership interest in PPI. Steenson has not listed all of his transfers within the last two years next preceding the filing of the Petition. Steenson does not list Dobbs, Barrett or Jimmy Ray Smith as creditors, and did not reflect transfers to them or others within the last two years. Steenson did not list the amount of actual cash he had as of the date of the filing of the Petition. Steenson claimed an exemption under an alleged 401K, even though such 401K had been cashed out prior to the filing of his Petition. Steenson identified that while he was employed, he received no income or expense payments for the preceeding year.

42. From his Statement of Affairs, Steenson reflected no payments to insiders, and yet Steenson has made Title Max interest payments for a vehicle driven by his stepson. Steenson reflected no gifts in response to question 13 of the Statement of Affairs, whereas the jewelry purchased at Jimmy Ray Smith Jewelry was for his ex-wife. Steenson reflected no gifts to charities in excess of $600, whereas the records of PPI reflect payments on his behalf to a charity in amounts

11

which far exceed such sum; Steenson stated that he had no trades or transfers of assets when, in fact, he had the vehicles identified hereinabove. Interestingly, Steenson initially stated that he had paid no money for the filing of his Bankruptcy Petition. While ultimately acknowledging in the Petition that he paid George Babakitis $525, he still fails to list a payment of $1,000 to Mr. Harry Long and a payment of $2,500 to Mr. Tazewell Shepherd all for bankruptcy assistance.

43. Steenson claims that the only monies he has received this calendar year were from the liquidation of his 401K account in the amount of $13,000, and yet he fails to include the Myron Orr cash on any of the cash monies he received over the last year or more, and cannot account for where such funds were used other than to indicate blithely that such were used to "live on." He has no receipts for the diminution and use of such funds and, hence, he fails adequately to explain satisfactorily his loss of assets or his absolute failure to retain financial records.

## COUNT ONE

45. PPI claims that the payment of corporate funds for the payment of personal benefits of Steenson constitutes an embezzlement of the assets of PPI. Similarly, the use of corporate assets for extended periods of time without remuneration, constitutes an embezzlement of those assets. Such embezzlement constitutes a breach of Section 523(a)(2) and the amount of such obligation is due to be excepted from any Discharge which may be obtained by Steenson.

46. PPI claims that the money obtained by Steenson, to include checks written to cash as well as payment of personal expenses, were obtained by false pretenses or actual fraud in that Steenson claims that such items were to be identified as income and further claims that each of such items allegedly was revealed to the accountant for PPI when, in fact, neither event occurred. As

12

Case 16-80073-CRJ    Doc 1    Filed 08/11/16    Entered 08/11/16 14:32:41    Desc Main
Document      Page 12 of 15

such, PPI claims that such amounts should be excepted from any Discharge obtained by Steenson pursuant to Section 523(a)(2)(A).

47. PPI avers that, as set forth hereinabove, Steenson was a fiduciary of PPI and the acts of embezzlement and fraud as described above constitute a breach of Section 523(a)(4). The amount of such damages occasioned in this regard should be excepted from any Discharge of Steenson.

48. PPI alleges that the actions of Steenson as described hereinabove, were both wilful and malicious and did thereby cause injury to PPI and to its creditors and as such constitutes a breach of Section 523(a)(6).

WHEREFORE PREMISES CONSIDERED, PPI demands judgment against Steenson for the amount of such damages incurred from such activities, seeks entry of an Order excepting such amount from any Discharge obtained by Steenson, costs of this action, and for such other, different and further relief as to which it may be entitled.

## COUNT TWO

49. PPI alleges that Steenson, with the actual intent to hender, delay or defraud did fraudulently transfer assets of PPI, as described hereinabove. As such, the transfer constitutes a breach of Section 727(a)(2) within one year next preceding the filing of the Petition and, pursuant to the authority of *Husk International Electronics, Inc. v. Ritz, supra*, no Discharge of Steenson is appropriate.

50. PPI avers that, in violation of Section 727(a)(4), Steenson did knowingly and fraudulently make a false oath through the filing of his Petition, Statement of Financial Affairs, Schedules, all as amended, through the failure to identify those assets and liabilities set forth with particularity above. As such, any Discharge of Steenson should be avoided.

13

Case 16-80073-CRJ   Doc 1   Filed 08/11/16   Entered 08/11/16 14:32:41   Desc Main
Document      Page 13 of 15

51. PPI alleges that Steenson has failed to explain satisfactorily his loss of assets and the deficiency of assets to meet his liabilities and that pursuant to Section 727(a)(5) no Discharge should be granted to Steenson.

51. PPI avers that Steenson has failed to keep or preserve recorded information from which his financial condition or business transactions could be ascertained, all without justification, and is more fully described hereinabove. As such, Steenson should be denied a Discharge pursuant to Section 727(a)(3).

WHEREFORE PREMISES CONSIDERED, PPI seeks entry of an Order under Section 727 of the Bankruptcy Code avoiding any Discharge or otherwise denying any Discharge of Steenson. PPI seeks such other, different and further relief to which it may be entitled.

_____
Lee R. Benton (ASB-8421-E63L)
Attorney for Priceville Partners, LLC

BENTON & CENTENO, LLP
2019 Third Avenue North
Birmingham, Alabama 35203
Telephone: (205) 278-8000
Facsimile: (205) 278-3492 (Direct)
E-mail: lbenton@bcattys.com

## CERTIFICATE OF SERVICE

      I hereby certify that a copy of the above and foregoing has been electronically filed with the Court and served by electronic notice generated via the Court's ECF system and by depositing a copy of same in the United States mail, properly addressed, on this __11__ day of August, 2016.

Gregory R. Steenson
38 Jackson Way
Decatur, Alabama 35603

George Babakitis, Esq.
2015 1st Avenue North
Birmingham, AL 35203

Richard M. Blythe, Esq.
United States Bankruptcy Administrator
P. O. Box 3045
Decatur, Alabama 35602-3045

Judith Thompson, Esq.
P.O. Box 18966
Huntsville, AL 35804

                                          s/Lee R. Benton
                                          Of Counsel